## SMITH v. FONTANA.

District Court, S. D. New York.

Dec. 1, 1942.

56

Ellsworth Baker, of Monticello, N. Y., for plaintiff.

John D. Lyons, of Monticello, N. Y. (Lawrence H. Cooke, of Monticello, N. Y., of counsel), for defendant.

GALSTON, District Judge.

The complaint in this action sets forth two causes of action. It is urged by the plaintiff that the first cause of action is for damages caused by an alleged false arrest, and the second for damages arising out of malicious prosecution. In the effort to extend liberality in the interpretation pleadings, the trial proceeded on the premise that there were two causes of action involved, one for false imprisonment and one for malicious prosecution.

It is alleged in the first cause of action that the defendant, on December 6, 1940, maliciously and with intent to injure the plaintiff, filed an information with the Justice of the Peace, "which information, however, failed to charge the commission of any crime and did not confer jurisdiction upon the Justice of the Peace * * * to institute criminal proceedings against the plaintiff". Thereupon the Justice of the Peace issued a warrant for the arrest of the plaintiff and he was charged with grand larceny in the second degree, "in feloniously appropriating to his own use the sum of $150." Thereupon the plaintiff was ar-

rested and appeared before the Justice of the Peace. He waived examination and was held by the Justice of the Peace for action by grand jury. Thereafter, on January 21, 1941, the grand jury of the County of Sullivan investigated the charge, heard the testimony, and failed to indict the plaintiff.

The second cause of action charges that the defendant, "without reasonable or probable cause * * * maliciously and with intent to injure the plaintiff * * * knowing the charge * * * to be false", laid the certain information described in the first cause of action before the magistrate.

The plaintiff is an attorney at law who at the time of the arrest had been practicing at Livingston Manor in Sullivan County, State of New York. The defendant was born in Italy, arrived in the United States about 1885, lived in New York City until about 1900, and then became a resident of Livingston Manor and has lived there ever since. He is eighty years of age, and though he does not readily understand nor fluently speak English, he has some understanding of the language and is able to speak it. Fontana was a client of the plaintiff. Fontana told Smith he believed he had been admitted to citizenship in the City of New York during the time that he resided there, and that a certificate had been given him at the time. He told Smith he had lost the paper when he moved to Livingston Manor. As a result, he said, Smith agreed to go to New York to make a search of the records to establish his citizenship. Fontana gave him $50 as a fee. Smith went to New York, made a search of various court records, but was unable to procure the necessary proof. Prior to this talk with Smith, Fontana had obtained a blank form of application for first papers and had requested Smith to fill out the application. It was then that Smith told him that there was no necessity for filling out the application if he was already a citizen and that it would be "an easy matter to get a certificate showing that he had been naturalized".

On Smith's return to Livingston Manor he reported to Fontana, who insisted that he had been admitted. So Smith paid a second visit to New York and this time examined the files of the Federal Court kept at 641 Washington Street. Failing to find any record concerning Fontana's citizenship he returned to Livingston Manor and made a second report to Fontana. Fontana told Smith he had voted in New York. A further search by Smith failed to show that Fontana had ever registered as a voter between the years 1888 and 1901. Then Fontana showed him a declaration of intention which he had executed in Sullivan County on December 6, 1927, subscribed and sworn to before Roy C. Johnston as Clerk of the Sullivan County Court. Though Fontana produced this declaration of intention he still insisted that he was a citizen. Smith testified: "he asked me to go to Washington to check even further on his record. At that time he gave me a hundred dollars."

It is at this point that essential contradiction develops in respect to the conversation that took place between the parties. Fontana's version is quite different. He said that Smith came to his home and told Fontana, in answer to the latter's question as to whether he had his papers: "I have everything in two days * * *. Well, a man down in Washington, he got to make it for you." Fontana said: "Who is that man?" Smith looked at him and said: "He want a hundred dollars." Fontana said: "Well you bring the papers and you will get the hundred dollars." But Smith insisted that he receive the hundred dollars first. Thereupon Fontana gave the money to Smith. Smith never obtained the proof, telling Fontana at one time; "Don't be in a hurry; that paper be coming; don't be afraid and everything coming."

Subsequently, some time in August, or September of 1940, Fontana told the story to Roy Johnston, a friend of his who had been County Clerk of Sullivan County in 1927, but was then, in the fall of 1940, County Treasurer. After hearing Fontana's story Johnston took Fontana to see the District Attorney of Sullivan County. Mr. Deckelman, the District Attorney, told him that in his opinion it was a matter that should be investigated by the United States Attorney and that he would forward his affidavit to the United States Attorney for the Southern District of New York.

However varied the stories of Smith and Fontana may be, it does appear that Smith obtained the $150 from Fontana, $50 on one occasion and $100 on the second; that Smith made various trips to New York and that he said he was going to Washington. The stories disagree in respect to the purpose of his visit to Washington and what was to be done with the hundred dollars

obtained prior to the proposed trip to Washington. There is also doubt whether Smith actually did go to Washington. His testimony is none too convincing on that point, nor, indeed, does it appear why, as a lawyer, he found it necessary at all to go to Washington.

On September 21, 1940, he wrote to the Department of Justice, Bureau of Immigration and Naturalization, representing that his client, Fontana, claimed American citizenship; and that he had lost his papers including the certificate of naturalization. Smith requested the Department to check its records and send "the necessary data along with the application for obtaining a duplicate of Mr. Fontana's admission to citizenship". To that letter the Department replied on October 9, 1940, enclosing a circular of information and also a form of affidavit to be used. It does not appear from the record that the affidavit required by the Department for furnishing the information was ever filed. Smith could not identify the person whom he saw in Washington and there is no record in respect thereto. Zicherman, a special investigator of the Immigration and Naturalization Service of the Department of Justice, interviewed Smith. Smith told him that after getting the formal reply from the Department of Immigration and Naturalization, he went to Washington in connection with the case and saw some woman in the Office of the Department, that he didn't know her name nor could he describe her particularly. Smith told him that the woman had stated that in her opinion he would have an extremely difficult time in obtaining any new certificate, since no record of the original naturalization could be located by him and the clerk in the courts of New York. According to Zicherman, Smith stated that he returned to Livingston Manor and then obtained the payment from Fontana of one hundred dollars some time in the early part of October. Smith admitted that at no time had he filed an application of any nature with the Department on behalf of Fontana; also that he had no idea what procedure was to be followed in the case. When asked by Zicherman why he had demanded the additional fee of one hundred dollars from Fontana, "he replied to the effect that as a lawyer he was not working for nothing."

The varied versions of time and circumstance in connection with the passing of one hundred dollars are not reconcilable and I am compelled to reach the conclusion, after listening to the witnesses, that the defendant sincerely believed that Smith was to pay the hundred dollars to some person in Washington in order to procure proof of citizenship for him. Moreover, it must also be inferred from the evidence that Smith made no explanation satisfactory to Fontana to account for his failure to produce the certificate of naturalization after the Washington trip. It was a natural thing, therefore, for him to tell his friend, Johnston, what had taken place. As I have recited, the district attorney was of opinion that there should be investigation by the federal authorities. Such an investigation was carried on by a special investigator, himself a lawyer, who reported his findings and conclusions to the district attorney. Thereupon the district attorney directed the special agent to interview Fontana and have him go before the Justice of the Peace. Zicherman then told Fontana that the district attorney was of opinion that "the crime of grand larceny had been committed, and that Mr. Fontana was to institute the necessary papers upon which to issue a warrant for Mr. Smith's arrest."

As has been described, the arrest, the arraignment, the holding for the grand jury, and the failure of the grand jury to indict, all followed. The questions presented, then, are whether in the circumstances plaintiff has a cause of action for false imprisonment and for malicious prosecution.

It is significant that no effort was made by the defendant to get a return of the money which he had paid the plaintiff. That he had been wronged, or at least that he believed he had been wronged, there is no doubt. From the foregoing facts it must follow that he had probable cause to do what he was advised to do by men who, he had the right to believe, were informed concerning the state of the law. Since jurisdiction of this case rests on diversity of citizenship, the local law of New York governs. Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, 114 A. L.R. 1487. In Wass v. Stephens, 128 N. Y. 123, 28 N.E. 21, the New York law as to malicious prosecution is summarized and it is stated that the plaintiff must show that the prosecution was instigated by the defendant, that it had been determined in his favor, that there was no probable cause, and that the defendant acted from malice.

As to what constitutes probable cause it was stated that that question does not depend upon whether an offence has actually been committed or upon the innocence of the accused, but upon the prosecutor's belief of the guilt of the accused, based upon reasonable grounds, citing Fagnan v. Knox, 66 N.Y. 525. In Burt v. Smith, 181 N.Y. 1, 73 N.E. 495, 496, 2 Ann.Cas. 576, it is said: "The want of probable cause does not mean the want of any cause, but the want of any reasonable cause such as would persuade a man of ordinary care and prudence to believe in the truth of the charge. Probable cause does not necessarily depend upon the actual guilt of the person prosecuted, but may rest upon the prosecutor's belief in his guilt, when based on reasonable grounds. * * * If probable cause exists, it is an absolute protection against an action for malicious prosecution, even when express malice is proved." See also Rawson v. Leggett, 184 N.Y. 504, 77 N.E. 662; Burns v. Wilkinson, 228 N.Y. 113, 126 N.E. 513; and Simpson v. Coastwise Lumber & Supply Co., 239 N.Y. 492, 147 N.E. 77. Restatement of the Law of Torts, Vol. 3, Sec. 666.

Applying these general principles to the facts of this case we find here the defendant eighty years of age, not understanding English too well, and not able to express himself too clearly, advised in his course of action by two high county officials, a treasurer and a district attorney, and by a special investigator of the Department of Justice, himself a lawyer, that a crime had been committed. He certainly had probable cause, believing the facts as he had recited them to the advisers, to press his charge before the Justice of the Peace.

From the evidence I believe that Fontana understood Smith to say to him that he required the hundred dollars to pay some man in Washington in order to procure the necessary papers evidencing his citizenship. That understanding is a pivotal fact of the case. Moreover, as to what actually developed concerning the demand for payment of one hundred dollars, Zicherman's recital of Smith's statement to him that he had obtained the additional payment after going to Washington casts considerable doubt on the accuracy of the Smith version of the conversation that took place with Fontana, as testified to by Smith at the trial.

This finding of probable cause requires that judgment be rendered for the defendant on the second cause of action.

In respect to the first cause of action, even if it be construed to state an action for false imprisonment, there is likewise failure of proof. The plaintiff argues that the information was insufficient in that it did not charge a crime and that therefore the magistrate had no jurisdiction to issue the warrant. If the information laid before the justice of the peace was sufficient to give the magistrate jurisdiction and to call upon him for a decision, the warrant issued upon that information is not void, and the arrest is not unlawful, even though the justice of the peace may have erred. In Vittorio v. St. Regis Co., 239 N.Y. 148, 145 N.E. 913, 914, it was said: "We may not test the sufficiency of an information, even when attacked directly, by the same rules and standards of technical correctness as were formerly applied to a common-law pleading, and, especially when the attack on the sufficiency of the information is made collaterally, 'great latitude of construction should be indulged in.' Swart v. Rickard, supra [148 N.Y. 264, 42 N.E. 665]."

The information laid by Fontana before the justice of the peace recited that Smith at a certain time, in a certain place, committed the crime of grand larceny by feloniously, falsely and knowingly appropriating the sum of $150 by falsely representing that he would obtain a duplicate copy of Fontana's original certificate of naturalization, and that for such purpose it would be necessary for Smith to travel to Washington in Fontana's behalf, and that $100 thereof would be paid by Smith to an unnamed person for assistance in Fontana's behalf. The plaintiff argues that the information does not charge a crime because it sets forth a promise of the plaintiff to do something in the future, and because there is no statement in the information that the plainiff made any misstatement as to an existing fact, but promised merely to do something in the future. The plaintiff relies on People v. Zambounis, 251 N.Y. 94, 167 N.E. 183; People v. Grogan, 260 N.Y. 138, 183 N.E. 273, 86 A.L.R. 1266. It is true, as was said in People v. Sloane, 254 App.Div. 780, 4 N.Y.S.2d 784, that promises or representations relating to the future are not ordinarily indictable. See also People ex rel. Gellis v. Sheriff, 251 N.Y.

33, 166 N.E. 795. But a careful examination of the information discloses a description of existent facts, to wit, that Smith had wrongfully and corruptibly appropriated the sum of $150 by then presently falsely representing that he would obtain a duplicate copy of an original certificate of citizenship, and that of that amount of money, $100 would be required to enable Smith to pay another person for assistance in the case. It is idle to say that the information recites a promise to be fulfilled in the future by Smith, because that promise was stated to be a then existent false representation, meaning that Smith had no intention of fulfilling the promise by paying over the money to some other person in Washington. Adams v. Gillig, 199 N.Y. 314, 92 N.E. 670, 672, 32 L.R.A.,N.S., 127, 20 Ann.Cas. 910, considered the question of the alleged intention of the defendant to build a dwelling upon the lot which he sought to purchase. It is true that the case was of a civil and not a criminal nature, but it was said by the court: "We are of the opinion that the false statements made by the defendant of his intention should under the circumstances of this case be deemed to be a statement of a material, existing fact of which the court will lay hold for the purpose of defeating the wrong that would otherwise be consummated thereby."

So on the first cause of action judgment must also be rendered for the defendant.

Findings of fact and conclusions of law may be submitted pursuant to Rule 52 of the Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c, and in accordance with the foregoing opinion.